1  claims in the arbitration that Unicover breached its
2  fiduciary duty to you in allowing the placing of this
3  other type of retrocessional coverage that I -- I have
4  to tell you right now I don't totally understand but I
5  -- I think for this purpose it's not important that I
6  really understand the intricacies of it. Is that part
7  of the factual basis of your claim?
8              MR. BEERBOWER: Could I re -- re -- restate
9  'cause I'm not sure I understood your words.
10             THE COURT: Well, you -- you told me --
11             MR. BEERBOWER: The --
12             THE COURT: -- you told me two things that
13 were the basis of your claims against Aon and Ratner.
14 And let me just take them aside for one moment.
15             As I understand it, you're -- the claims
16 against Pallat and the individuals vis-a-vis Aon and
17 Ratner are going to be that they conspired with them in
18 these bad things that Aon and Ratner did. Correct?
19             MR. BEERBOWER: Yes.
20             THE COURT: All right.
21             You said two things that would be the basis
22 of your claims against -- the factual basis of your
23 claims against Ratner and Aon in this case.
24             What I need to know is whether the -- the
25 factual basis that you have described to me of -- on

1           And your next question would be:  Suppose the
2  panel concludes that Unicover did not have a duty to
3  tell us.  I say fine.  As to Cragwood I -- I've lost
4  that claim.  Is that binding in any sense on whether n
5  Aon had a duty to tell us?
6           THE COURT:  But --
7           MR. BEERBOWER:  No for two reasons.
8           THE COURT:  -- but -- but --
9           MR. BEERBOWER:  Different duty; second --
10          THE COURT:  -- but are you saying that Aon
11 and -- if the panel decides that Unicover told you
12 everything they needed to tell you or, alternatively,
13 that maybe they didn't have to tell you because under
14 the agreement they didn't have to tell you or whatever
15 the conclusion is, how are you going to allege that Aon
16 and Ratner did something wrong when the panel has
17 already decided that there was nothing wrong in what
18 was done?
19          MR. BEERBOWER:  Your Honor, the panel would
20 be looking -- if the question is resolving the dispute
21 between two parties and -- and determining the rights.
22 The panel will look at it.  And your hypothetical is if
23 the panel concludes that --
24          THE COURT:  Yes.  But -- but see --
25          MR. BEERBOWER:  -- Unicover did not breach

1   its duty --
2           THE COURT: Okay.
3           MR. BEERBOWER: -- that the --
4           THE COURT: The point that I'm making is that
5   is there any independent thing that Aon and Ratner did
6   over and above and beyond what Unicover did so that you
7   could say that Aon and Ratner actually did something
8   worse?
9           MR. BEERBOWER: Yes. Aon and Ratner owed
10  independent duties to ReliaStar.
11          THE COURT: Let's -- let's do it a different
12  way. The panel concludes that ReliaStar got all the
13  information it was entitled to.
14          MR. BEERBOWER: All right.
15          THE COURT: Okay.
16          So Uni -- they -- they find Uni --
17          MR. BEERBOWER: But -- but you mean sort of
18  by -- by some universal standard? Presumably what they
19  would decide is --
20          THE COURT: Well, if --
21          MR. BEERBOWER: -- all the information --
22          THE COURT: -- if the panel decided that --
23  that ReliaStar got all the information they were
24  entitled to --
25          MR. BEERBOWER: All the --

1           THE COURT:  -- how could Aon and Ratner --
2           MR. BEERBOWER:  -- entitled to --
3           THE COURT:  -- breach the duty if -- if
4  ReliaStar found out everything they -- they needed to?
5           MR. BEERBOWER:  Your Honor, all the panel at
6  best could do is say that ReliaStar got everything from
7  Unicover it was entitled to get from Unicover.  For
8  example, the panel might say if -- if the facts were in
9  front of them in their head it was Aon's duty to tell
10 them.  And we've got the argument made, well, next one
11 that says, you know, gee, you know, the knowledge of
12 this agent should be attributed to the principal.  And
13 therefore, since Aon knew what was going on ReliaStar
14 had to know what was going on vis-a-vis the -- I mean,
15 it doesn't -- it doesn't work that way.
16          The issue is Unicover has certain obligations
17 to us.  If those get addressed in the arbitration there
18 will be a decision.  It will say whether Unicover's
19 obligations were followed or violated.  It doesn't say
20 anything about Aon's obligations.
21          THE COURT:  I -- you know, I may be having a
22 hard time in articulating this.  And I do recognize
23 that there are arguments that you have that there were
24 different duties, separate duties -- maybe not
25 different but separate, discreet duties owed to you by

1   ReliaStar, another duty owed to you by Aon, another
2   duty owed to you by Ratner.  I -- I -- I understand
3   that, different -- separate duties.
4           MR. BEERBOWER:  Right.
5           THE COURT:  Okay.
6           What I'm saying is what is -- there's a
7   factual basis that you're going to allege that you're
8   going to say presents facts that show that Unicover
9   violated its fiduciary duty to us.  Right?
10          MR. BEERBOWER:  I'll assume that.  Yes.
11          THE COURT:  We have no facts to show that
12  they violated the -- the fiduciary duty.  It's going to
13  be the underlying factual basis to the claim of
14  violation of fact -- of fiduciary duty.
15          MR. BEERBOWER:  Right.
16          THE COURT:  What I'm saying is are the facts
17  that you're going to allege that form the basis of the
18  breach of fiduciary duty claim against Aon and Ratner,
19  are those facts different?
20          MR. BEERBOWER:  Yes.
21          THE COURT:  How are they different?  What are
22  they that are different?
23          MR. BEERBOWER:  The claims against Aon and
24  Ratner will be based upon what Aon and Ratner knew,
25  based upon what Aon and Ratner said or failed to say

1   and those are the facts and whatever the legal duties
2   and obligations including an obligation not to -- to
3   misrepresent or commit a fraud --
4           THE COURT:  Are you --
5           MR. BEERBOWER:  None of those --
6           THE COURT:  -- going to allege that either
7   Aon or Ratner knew something more than Unicover knew?
8           (Pause)
9           MR. BEERBOWER:  I -- I -- I'm -- one of the
10  reasons I'm hesitating, I mean, obviously, there --
11  there -- there will be some -- some discovery in this
12  case --
13          THE COURT:  No.  But --
14          MR. BEERBOWER:  -- and we'll --
15          THE COURT:  -- what I'm saying is --
16          MR. BEERBOWER:  -- and -- and the --
17          THE COURT:  -- your breach of fiduciary duty
18  against Unicover is going to say, well, they knew this,
19  they knew that and five things they knew that they
20  should have told us and didn't.  And that's violated
21  their duty to us.
22          Are there things in addition to those five
23  things that either Ratner or Aon knew --
24          MR. BEERBOWER:  Your Honor --
25          THE COURT:  -- but they didn't tell you or --

Colloquy

1  or is it the same five things?
2           MR. BEERBOWER:  Well, it -- you know, if you
3  -- if you think about it for a moment the -- the --
4  it's -- it's in -- you can say fraud, are we alleging
5  fraud against all of them?  Yes.  You go down
6  ultimately to prove it, we're going to have to
7  establish what was known by particular individuals and
8  those will be unique and distinct to those individuals
9  what was said or done by those particular individuals.
10          So you know, if you -- if you create a
11 category that's general enough, yes, it's the same for
12 all of them.
13          THE COURT:  If -- if you look at --
14          MR. BEERBOWER:  But the facts and the proof
15 --
16          THE COURT:  -- if you look at knowledge as
17 concentric circles and the first circle is the
18 knowledge that Unicover had, is the diameter of
19 Ratner's knowledge larger in the concentric circle than
20 the knowledge of Unicover?
21          MR. BEERBOWER:  I don't know whether it's
22 larger, smaller.  It is different.  You can't tell -- I
23 mean, Your Honor, again, to understand what we're
24 talking about here is Ratner and Aon representatives
25 talked to people at Unicover, you know, sometimes in a

1  meeting, some were -- they talked to people
2  representing the retrocessioners. They picked up
3  information. There's information that Mr. Smith
4  obtained, some of which he conveyed to -- to Mr. Pallat
5  we -- we know from the documents. Did he convey
6  everything he knows? We don't know 'cause Mr. Smith,
7  of course, refused to -- so we don't know what all Mr.
8  Smith knew. But we -- we know what party conveyed to
9  Mr. Pallat. Did he tell the truth? Well, I don't know
10 that. But if he told the truth we, you know, there
11 will be that overlap, it will be the same because Mr.
12 Smith told Mr. Pallat something. Now, it's quite
13 possible what Mr. Smith told Mr. Pallat wasn't really
14 what Mr. Smith knew and may not be true, and Mr. Pallat
15 may be able to establish that. And -- and in which
16 case Mr. Pallat was given incorrect information.
17 There are all kinds of things that come up.
18         Let me throw in one last piece, though, which
19 is I would also submit to you. That if -- even if the
20 arbitrators find that Unicover did not violate these
21 obligations and even if it were true that all --
22 whatever we have, nine individuals or something
23 involved, all thought the same thoughts, all spoke at
24 the same time saying the same -- the same things, all
25 wrote the same letters and all the rest of it, we still

1   would have an opportunity to -- to present this claim
2   against Aon and Ratner because they're -- we have no
3   arbitration agreement. They are going to -- they are
4   never going to admit that they're bound by any of this.
5   We could have a complete victory against Cragwood and
6   Unicover. We still get to present it because we get a
7   judicial determination of their breach of fiduciary
8   duty, of the legal standards.
9           THE COURT: Specifically --
10          MR. BEERBOWER: The arbitrators are not
11  required to apply the law.
12          THE COURT: -- specifically as to Pallat and
13  Dunn and what's the --
14          MR. BEERBOWER: Wojtowicz.
15          THE COURT: Wojtowicz, if ReliaStar is not
16  responsible what are your factual allegations that they
17  would be other than their alleged conspiracy with
18  Ratner and Aon?
19          MR. BEERBOWER: If -- if Unicover's not
20  responsible?
21          THE COURT: Right.
22          MR. BEERBOWER: Well, again, for example, if
23  -- if -- if we have not, as we did not last time, had
24  access to Mr. Dunn, we still -- you know, he's not --
25  it may be that we -- we effectively are deprived of our

1   rights against Cragwood because we'll be bound by that
2   decision even though -- in the arbitration even though
3   we didn't know the underlying facts. But to take the
4   last one, that's complete free game. There's no way
5   that, you know, by -- by withholding the information
6   one can then -- then claim that I've been -- been
7   absolved by the decision.
8         So I -- I have a little trouble. You know,
9   he -- he is not -- not -- we do have allegations in
10  here about Olga Re (phonetic), the -- the -- the
11  off-shore which -- which is --
12        THE COURT: Only -- only as to being part of
13  the enterprise under the RECO claim.
14        MR. BEERBOWER: No, no. I mean, allegations
15  that that was part of the fraud.
16        THE COURT: Okay.
17        MR. BEERBOWER: And that comes up next time
18  on -- on other issues. That was not a -- you know, as
19  -- as the defendants clearly pointed out, the Olga Re
20  had a different economic interest from Cragwood and
21  activities undertaken there, you know, would not be
22  attributable to Cragwood. I -- there -- there are a
23  host of facts that -- that could -- but take the simple
24  -- I mean, like break it down. Mr. Pallat comes
25  forward. There's full discovery of Mr. Pallat. Of

Colloquy                                                    95

1  course, if there isn't discovery of Mr. Dunn there's
2  really not full discovery of Mr. Pallat either because
3  they worked together and they communicated with each
4  other.  So -- so I guess I'd say without full
5  discovery, yes, it's all free except for Cragwood.  I
6  mean, Cragwood, if they manage to get through the
7  arbitration, I mean, they -- res judicata.
8          THE COURT:  Okay.
9          Let me go to the complaint.
10                  (Pause)
11         THE COURT:  Okay.
12         The first cause of action, civil conspiracy
13 and fraud by all defendants.  You make allegations in
14 149 and 150 that it appears that you're alleging that
15 the individual's liability is derivative to that of
16 Unicover.
17         MR. BEERBOWER:  I ...
18                  (Pause)
19         MR. BEERBOWER:  Oh.  Okay.  On this, the
20 breach of Unicover's duty.  Yes.
21         THE COURT:  On the fifth cause of action,
22 which is conspiracy to defraud by Pallat, Dunn and --
23 I'm never going to get it right.  Say it again?
24         MR. WEISBERG:  Wojtowicz.
25         THE COURT:  Wojtowicz.

```
----------------------------------------x
In the Matter of the Arbitration between        :

SUN LIFE ASSURANCE COMPANY OF                   :
CANADA, PHOENIX HOME LIFE MUTUAL
INSURANCE COMPANY, AMERICAN PHOENIX             :
LIFE AND REASSURANCE COMPANY, and
COLOGNE LIFE REINSURANCE COMPANY,               :

                            Petitioners,        :

        -and-                                   :

UNICOVER MANAGERS, INC., CONNECTICUT            :
GENERAL LIFE INSURANCE COMPANY,
LINCOLN NATIONAL LIFE INSURANCE COMPANY,        :
LIFE REASSURANCE CORPORATION OF AMERICA,        :
and RELIASTAR LIFE INSURANCE COMPANY,

                            Respondents.        :

----------------------------------------x
```

REPLY BRIEF OF PETITIONERS
PHOENIX LIFE INSURANCE COMPANY AND
AMERICAN PHOENIX LIFE AND REASSURANCE COMPANY

# INTRODUCTION

## THIS CASE IS ABOUT UNICOVER'S INTENTIONAL AND DECEPTIVE CONDUCT

This reply brief is respectfully submitted on behalf of Petitioners Phoenix Life Insurance Company (formerly Phoenix Home Life Mutual Insurance Company) and American Phoenix Life and Reassurance Company (sometimes referred to collectively as "Phoenix"). The overwhelming evidence will clearly show that Unicover defrauded Petitioners through a series of intentional material misrepresentations and nondisclosures concerning the nature and volume of its business and its methods of operation. As demonstrated in detail in Phoenix's opening brief, Unicover, among other things:

- vastly understated the premium estimates for the December Whole Account beyond reason or any possible business expectation: the stated estimates were for $600 million of subject premium over three years, while the actual subject premium written was in excess of $7.3 <u>billion</u> through only the first 15 months;

- represented that it was underwriting very carefully selected business that was expected to yield better than average profits on a gross basis, when in fact the business was not carefully selected or underwritten, and Unicover had reason to believe it would yield huge gross losses;

- failed to disclose that it was in the process of aggressively pursuing the creation of facilities and/or pools in addition to the existing Unicover Pool, through which it intended to -- and did -- cede business to the December Whole Account, which exceeded the volume of business ceded through the Unicover Pool.

Throughout, Unicover breached its duty of utmost good faith, which is the guiding principal of reinsurance relationships, by:

- misrepresenting and concealing the nature and volume of the business it was writing and intended to write;

- creating, through its deal with Delphi Financial, a huge, undisclosed conflict between its own interests and its duties to Petitioners;

In the Matter of the Arbitration Between

SUN LIFE ASSURANCE COMPANY OF CANADA,
PHOENIX HOME LIFE MUTUAL INSURANCE
COMPANY, AMERICAN PHOENIX LIFE
AND REASSURANCE COMPANY and GENERAL
& COLOGNE LIFE RE OF AMERICA,

                              Petitioners,

-- and --

CONNECTICUT GENERAL LIFE INSURANCE
COMPANY, et al.,

                              Respondents.

BEFORE:

Thomas M. Tobin, Umpire
Daniel E. Schmidt IV, Arbitrator
Paul E. Dassenko, Arbitrator

## PRE-HEARING MEMORANDUM OF LAW OF PETITIONER GENERAL & COLOGNE LIFE RE

LeBoeuf, Lamb, Greene & MacRae, L.L.P.
Attorneys for Petitioner General &
Cologne Life Re of America
125 West 55th Street
New York, NY 10019
(212) 424-8000

Of Counsel

John M. Nonna
Larry P. Schiffer
Tracy A. Stein
Susannah J. Wakefield

business to the whole account agreement, and its full knowledge that the premium income estimates relied on by CLR were severely understated. What makes matters worse, many of the original pool members knew full well the damage that Unicover's business practices would cause to CLR and did nothing about it. In the end, Unicover's business strategy left CLR insolvent, while Unicover's principals reaped tens of millions of dollars of profit from their scheme.

Unicover argues that it disclosed to CLR the unprecedented increase in premium writings and business expansion and that CLR should have known that it had underpriced the whole account agreement and would suffer losses. As will be demonstrated, Unicover's "disclosures" were, at best, ambiguous, inconsistent, and confusing. These purported "disclosures" certainly did not give CLR notice that its solvency would be impaired by the excessive premium volume Unicover was writing. Moreover, Unicover cannot excuse its actions by protesting now that CLR should have figured out that it was being fooled.

Unicover's unconscionable behavior and its lack of regard for the financial solvency of CLR requires punishment. The original pool members who knew about and acquiesced in this intentional conduct should not profit from Unicover's actions, but should bear the financial cost of the risks they so readily allowed Unicover to write on their behalf.

## STATEMENT OF FACTS

A. **The Key Parties**

  1. **CLR and CRF**

CLR is a moderate-size Stamford, Connecticut licensed reinsurer of life, accident, and health insurance (Clark Tr 8). In its 1998 annual statement, CLR reported total capital and

3

299 Ill. App. 3d 1076, 1085 (App. Ct. 1998), *see also Compagnie de Reassurance d'Ile de France* 944 F. Supp. at 995-96 (recognizing cause of action for fraudulent concealment of material fact intended to create false belief). Here, Unicover breached its duties and committed fraud by engaging in an elaborate scheme involving unprecedented underwriting abuses and improprieties, and by taking opportunistic advantage of its retrocessionaires by writing billions of dollars of underpriced business.

### B.  Unicover Breached Its Duties and Committed Fraud Through a Scheme Involving Unprecedented Underwriting Abuses and Improprieties

Unicover's marketing and underwriting methods, when considered as a whole, were part of a well-orchestrated scheme of unprecedented underwriting abuses and improprieties. Through its scheme, Unicover created a huge loss-making business for the Whole Account retrocessionaires for the purpose of furthering Unicover's own self-interests and the interests of the non-retrocessionaire Pool members. In CLR's case, it had the effect of wiping out its entire surplus and capital.

Unicover set in motion a devastating market cycle based on under-priced workers' compensation rates, which culminated in the enormous growth of high volume, high loss producing risks ceded to the Whole Account. The cycle went like this: by underwriting and pricing only the first $10,000 of risk, Unicover did not price its reinsurance product to generate premium sufficient to cover the loss on the entire $500,000 layer. This practice was contrary to standard underwriting procedure. *See, e.g., Omaha Indemn. Co. v. Royal Am. Managers, Inc.*, 777 F. Supp. 1488, 1490 (W.D. Mo. 1991) ("[r]einsurance underwriting requires the exercise of specialized knowledge and skill. In the reinsurance industry, underwriters are expected to have and use their learning and skill to accept only business that has a reasonable probability of resulting in an underwriting profit.") Unicover charged a premium that was insufficient to cover

37

the entire risk and, therefore, the resulting losses were borne by CLR and the other retrocessionaires

Yet by offering cut-rate reinsurance, especially on the excess layers covered by the Whole Account, Unicover was able to attract more business even though the business itself was not the niche, well managed risks originally identified as Unicover's target market. Thus, Unicover's clients ultimately included a number of large national or regional workers' compensation carriers which otherwise would have retained the risk because reinsurance for these layers at such low rates was not normally available.[11] As a result, Unicover's growth surged and its clients were able to increase their own market share by providing cheaper workers' compensation insurance to their insureds. The results of this cycle are well known, especially in California where rate competition fueled the already soft workers' compensation market and resulted in regulatory action against, and the insolvency of, quite a few workers' compensation carriers.

In the end, the only reason why Unicover was able to provide under-priced reinsurance rates for large national and regional risks was because of the retrocessional coverage locked in under the Whole Account, which bore the brunt of the losses. Unicover and the non-retrocessionaire Pool members deliberately took advantage of the retrocessional coverage to offer under-priced reinsurance to its cedents and to expand the volume of the business, without the knowledge and consent of CLR (see MacGinnitie Report).

---

Indeed, MacGinnitie opined that "Unicover's offer of inadequately priced reinsurance inevitably encouraged inadequate primary rate levels in the primary worker's compensation market. Common sense, basic economics, and my experience in the industry tell me that underpriced reinsurance will contribute significantly to a soft market" (Expert Report, p. 4)

38

Unicover exacerbated its breach of good faith by failing to limit its clients, as it represented, to the profit-making specialty risks.[12] Pallat testified that Unicover looked to support underwriters that they thought could provide better than average results going forward and professed that they "wanted to write business that was underwritten by underwriters who out-performed their peers" (Pallat Tr. 1243-45). Now that Unicover was able to attract high volume programs, it simply ignored what it had represented, focusing instead on volume (the source of its huge fees), rather than niche-type specialty, "superior managed" books with better than average results that it promised (Pallat Tr. 522). That Unicover no longer sought niche business is important, because in a soft market there is only a finite amount of profitable business. By underwriting without regard to the entire risk and without limits on premium volume, Unicover necessarily acted without any concern about gross profitability and did so with the knowledge and consent of the non-retrocessionaire Pool members. Unicover cast off its promise to select risks with better than industry loss ratios. This meant that Unicover accepted business that it knew would be unprofitable on a gross basis.

There is no dispute that Pallat knew the loss ratios on the risks written into the Pool were substantial. To support his position that CLR should have known this, Pallat now claims that it was impossible "any statistically credible book of business we might underwrite" would yield a profit to the Whole Account (Pallat Tr. 524-25). Yet, quite incredibly, Pallat claimed that Unicover could cede as much volume as possible to the Whole Account because there were no limitations on the amount of premium volume (Pallat Tr 533). This cavalier and

---

[12] Curiously, Respondents' expert resorts to arguing that the retrocessionaires should not have believed Unicover and Rattner when it told them that Unicover could underwrite profitable books of business based on less than industry rates. To the contrary, Ashley opined that Unicover portrayed itself as a highly professional manager with unique access to small but highly profitable books of business. The combination of these two factors would allow the business to be written at less than market terms and still yield excellent results for all concerned – a seductive argument for underwriters, especially when they are informed that the principals are retaining some of the risk in their personal capacity. The message that everyone's interests were aligned was clearly stated.

39

greed-driven attitude demonstrates how Pallat so manifestly misunderstood the nature of his contractual obligations, both of utmost good faith to CLR as a retrocessionaire and of good faith and fair dealing in all contracts, long recognized as a matter of law.

In short, Unicover, with the support of the non-retrocessionare Pool members, put in motion an abusive scheme that would necessarily result in massive premium volume on under-priced non-specialty risks. Unicover knew, or should have known, that CLR's modest surplus and capital of less than $150 million could not absorb the $2.5 billion onslaught of premium and that CLR would suffer huge losses based on this improper underwriting scheme. Ceding such a massive volume of under-priced risks to the Whole Account exacerbated the breaches of Unicover's underwriting obligations. By increasing premium volume beyond any reasonable expectation, Unicover clearly knew or should have known that the losses to the retrocessionaires would be devastating and, in CLR's case, insolvency threatening. Dunn knew this, admitting as much in a December 16, 1998 memo, in which he told Pallat:

> Unicover must set and adhere to controlled growth guidelines in conjunction with, and with the agreement of all its suppliers. These should contemplate an ongoing underwriting and/or re-underwriting process whose goal is the achievement of acceptable underwriting results to all suppliers.

(Ex. 1273). Unicover did not follow this advice.

Unicover had both a duty of utmost good faith and a duty of good faith and fair dealing to refrain from acting with such callous disregard of the retrocessionaires. The totality of Unicover's underwriting abuses, as well as its misrepresentations and concealment of its underwriting methodologies and marketing, warrant relief from the Whole Account.